UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J.T. SUTTON,                                                Case No. 16-10949

          Plaintiff,                              Linda V. Parker
v.                                                                  United States District Judge

BLAISE GLENNIE, *et al*,                         Stephanie Dawkins Davis
                                                                    United States Magistrate Judge

          Defendants.
_____/

**REPORT AND RECOMMENDATION
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 25)**

## I.  PROCEDURAL HISTORY

*Pro se* plaintiff J.T. Sutton, who is currently confined at the Ionia

Correctional Facility, filed a prisoner civil rights complaint on May 15, 2016

against MDOC defendants Blaise Glennie, Lance Schuhmacher, Geraldine

Wilson, and Arlinda Hopkins (together "MDOC defendants"), for actions that

occurred while he was confined at the Thumb Correctional Facility.  (Dkt. 1).

Plaintiff brings claims under the First, Eighth and Fourteenth Amendments to the

United States Constitution, together with a state law negligence claim.  (*Id*. at Pg

ID 3-4).  On May 4, 2016, District Judge Linda V. Parker entered an Order

referring all pretrial matters to the undersigned.  (Dkt. 8).  On September 9, 2016,

the MDOC defendants filed a motion for summary judgment.  (Dkt. 25).  Plaintiff

responded on February 27, 2017 (Dkt. 29), and defendants filed a reply (Dkt. 30). The motion is now ready for report and recommendation.

For the following reasons, the undersigned recommends that defendants' motion for summary judgment (Dkt. 25) be **GRANTED IN PART** and **DENIED IN PART.**

## II.     PLAINTIFF'S COMPLAINT

Plaintiff first brings a claim for conspiracy/discrimination.  (Dkt. 1, ¶ 15). Plaintiff alleges that defendant Glennie, the recreation and music room supervisor at the Thumb Correctional Facility, conspired with other staff members to enforce his policy of removing all non-white prisoners from clerk positions in his department.  (*Id*.)  In support, plaintiff alleges that on January 25, 2013, both he and prisoner Brazemore received major misconduct tickets for substance abuse. Plaintiff says that after submitting urine samples that tested negative for marijuana, Lt. Bernstein presented false evidence that resulted in the charges being sustained.  (*Id*.)  On February 20, 2013, security classification committee members defendants Schuhmacher and Wilson reviewed the misconduct tickets, found both prisoners guilty, and placed both on 30 days non-contact visits.  (*Id*.)  According to plaintiff, Brazemore was able to return to his prison assignment in food service with no other sanctions; however, he was singled out and was removed from his prison assignment based on Glennie's policy of removing all non-whites from

clerk positions.  (*Id*.)  Plaintiff alleges that Glennie, Schuhmacher and Wilson

acted together and Glennie ordered plaintiff to train a white prisoner (Ryan) to run

the clerk's position in the music room.  (*Id*.)

On February 25, 2013, plaintiff claims that he was arbitrarily removed from

his prison assignment by Glennie.  (*Id*. ¶ 16).  Following his removal, plaintiff

filed a redress action to Warden Bergh about what he claims was TCF staff's

conspiracy to violate policy directive No. OP-TCF-05.02.11GC.  (*Id*.)  Plaintiff

alleges that his letters were ignored and he filed a grievance (No. TCF-130-301-

588-028I) alleging equal protection violations; however, the grievance coordinator

rejected it and returned all copies to plaintiff.  (*Id*. ¶ 17).  Plaintiff repeated the

process on March 6, 2013 (No. TCF-1309-381-610-028A); however, all

subsequent grievance attempts were also denied.  (*Id*.)

Plaintiff says that on or around March 20, 2013, he spoke with RUM

Wilson regarding his job termination and was told that things would get worse if

he did not stop making trouble.  (*Id*. ¶ 18).  According to plaintiff, it was Wilson's

responsibility to classify prisoners (violent versus passive) before cell assignment.

On or about April 15, 2013, prisoner Miles was moved into the cell with plaintiff

for, says plaintiff, the purpose of assaulting plaintiff for writing grievances.

Indeed, shortly after arriving, Miles informed plaintiff that he had a personal

relationship with defendant Wilson, and Miles began harassing plaintiff.  (*Id*.

3

¶ 19). On or around October 2013, defendant deputy warden Schuhmacher visited plaintiff in response to a grievance and informed him that he would not be returning to the music room job, agreed that plaintiff's removal was wrong, but indicated that it would not happen to anyone else. (*Id*. ¶ 20). Sutton claims that defendant Schuhmacher warned him that if he continued to complain, he would regret it. (*Id*.)

On or around November 2013, Shon Hart was promoted to administrative assistant over TCF and it appeared that warden Bergh had been removed. (*Id*. ¶ 21). Mr. Hart assured plaintiff that his complaint would be investigated and handled in compliance with MDOC policy. As a result of that investigation, on November 7, 2013, TCF staff was instructed to return Sutton to his position with back pay for the time he was laid in. On November 15, 2013, plaintiff was returned to his previous position in the music room. (*Id*. ¶ 22). Shortly thereafter, plaintiff began receiving intensified threats and harassment from his cell mate (Miles) regarding the grievances that he had written on defendant Wilson. (*Id*.)

Since the time Miles was assigned to reside in the cell with plaintiff, he was hostile toward plaintiff. Miles also spoke of a clandestine relationship with defendant Wilson. (*Id*. ¶ 23).

June 1 of every year is the official cell change date at TCF. According to plaintiff, on at least two occasions before June 1, 2014, plaintiff spoke with unit

officer Alcorn and informed him that plaintiff and Miles had a hostile relationship. Plaintiff verbally requested that one of them be moved to a different cell as soon as possible to alleviate the possible risk of serious harm. (*Id*. ¶ 24). On several occasions prior to June 1, 2013, plaintiff spoke personally with defendant Hopkins about the serious risk that plaintiff felt he faced concerning Miles. Defendant Hopkins instructed plaintiff to kite defendant Wilson, and Hopkins failed to take any further steps to relieve any risk of harm to plaintiff. (*Id*. ¶ 25). Plaintiff spoke to Hopkins on several occasions after June 1, 2013 regarding "heated arguments" with Miles and to request a cell change to alleviate the violent conflict, but his requests were disregarded. (*Id*. ¶ 26). On November 5, 2016, plaintiff wrote a kite to Wilson informing her of the "dire need" to change cells because of "unreconcilable hostilities" between plaintiff and Miles. (*Id*. ¶ 27). Again, on December 21, 2013, plaintiff wrote a letter to Wilson (after several kites), as she was the only one who could change a prisoner's cell. (*Id*. ¶ 28). Plaintiff warned Wilson that the two men needed to be separated immediately because of the risk of serious harm. Wilson, however, ignored all of plaintiff's requests and never responded. (*Id*.)

On January 5, 2014, prisoner Miles attacked plaintiff by striking him in the head with an unknown object, knocking him unconscious. (*Id*. ¶ 29). When plaintiff regained consciousness, Miles was beating him with a chair exclaiming:

"she (G. Wilson) told me to do this." (*Id*.) Prisoner Miles drove the leg of the chair through plaintiff's left arm, leaving his arm permanently disfigured. Plaintiff's injuries required outside emergency hospitalization where he received several stitches in his head. Plaintiff's left arm was permanently disfigured, his left eye was damaged, and his vision was permanently restricted. (*Id*.) Plaintiff seeks declaratory, injunctive, and compensatory relief for his injuries.

## III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On September 9, 2016, defendants Blasie Glennie, Lance Schuhmacher, Geraldine Wilson and Arlinda Hopkins filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56(a). (Dkt. 25). Defendants move under four separate legal theories: 1) plaintiff failed to properly exhaust his administrative remedies regarding certain complaint allegations; 2) plaintiff's retaliation claim fails because he has not established an adverse action, nor did any of the defendants have the authority to terminate plaintiff from his work assignment; 3) plaintiff has failed to state an unreasonable risk to his safety and has failed to establish that defendants knowingly disregarded any alleged risk; 4) defendants are entitled to qualified immunity because they acted reasonably and did not violate plaintiff's clearly established constitutional rights.

## III.  ANALYSIS AND CONCLUSIONS

A.  <u>Standard of Review</u>

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non- moving party. *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an

affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with

respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

B.    <u>Legal Analysis</u>

1.    <u>Exhaustion</u>

Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Section 1997e(a)'s "exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences." *Porter v. Nussle*, 534 U.S. 516, 520 (2002). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532. In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court held that "failure to exhaust is an affirmative defense under the PLRA," and "inmates are not

required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. "Compliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218. "Congress has provided in § 1997e(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). "[P]roper exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Brown v. Toombs*, 139 F.3d 1102 (6th Cir.), *cert. denied*, 525 U.S. 833 (1998) (No federal action shall be brought until such administrative remedies as are available are exhausted). In other words, a prisoner may not exhaust administrative remedies during the pendency of the federal lawsuit. *Larkins v. Wilkinson*, 1998 WL 898870, at *2 (6th Cir. Dec. 7, 1998).

In *Jones v. Bock*, the Supreme Court also held that the burden rests on the defendant to show that a plaintiff failed to exhaust when asserting exhaustion as an affirmative defense. *Id.* Accordingly, exhaustion is satisfied if plaintiff complied with the applicable grievance procedures and defendants bear the burden of showing otherwise. *See Kramer v. Wilkinson*, 226 Fed. Appx. 461, 462 (6th Cir. 2007) (a prisoner-plaintiff "does not bear the burden of specially pleading and proving exhaustion; rather, this affirmative defense may serve as a basis for dismissal only if raised and proven by the defendants.").

Here, defendants argue that they are entitled to summary judgment because plaintiff failed to exhaust his administrative remedies under the PLRA. However, as previously observed by a court in this district, summary judgment seems an inappropriate vehicle for adjudication because there is no determination on the merits of the case, and no "judgment" is entered. *See Neal v. Raddatz*, 2012 WL488827, at *2 (E.D. Mich. Jan. 12, 2012). Instead, a number of courts have characterized a request to dismiss for failure to exhaust administrative remedies as "subject to an unenumerated Rule 12(b) motion rather than a motion for summary judgment." *Id.* (quoting *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003); *see also Johnson v. Gregoire*, 2008 WL 5156428, *3 (W.D. Wash. 2008), citing *Ritza v. International Longshoremen's and Warehousemen's Union*, 837 F.2d 365, 369 (9th Cir. 1988) ("finding that while no defense described in 12(b)(1) through (7) encompasses failure to exhaust, federal courts traditionally have entertained certain pre-answer motions not expressly provided for by rule, and authority to hear such motions lies in federal court's inherent power to regulate actions pending before it"); *Thrasher v. Garland L*, 2007 WL 3012615, *1-2 (W.D. Wash. 2007) ("The proper motion to bring when asserting failure to exhaust administrative remedies . . . is an unenumerated 12(b) motion. . . ."). Based on the above, the *Raddatz* court determined that regardless of whether the motion is treated as one for summary judgment or as an unenumerated 12(b) motion, the

result is the same. (*Id*. at 3). If the court grants the motion, the dismissal will be without prejudice and it will not count as a strike under 28 U.S.C. § 1915(g). (*Id*.) The court concluded, however, that the latter approach, adjudicating the motion as an unenumerated motion under 12(b) was more consistent with the "true nature of the motion."[1] (*Id*.)

Defendants first argue that plaintiff has not properly exhausted most of the allegations in his complaint because he did not properly complete the grievance process regarding those particular issues. Specifically, defendants contend that while incarcerated at TCF, plaintiff filed four, Step III grievance appeals. (Dkt. 25, Pg ID 78; citing Ex. B). In Grievance TCF-14-01-2061-17bi, plaintiff complained that Schuhmacher and Wilson transferred him to another correctional facility in retaliation for filing a grievance, after he was assaulted by his cell mate, Miles. (*See* Dkt. 25, Ex. B-1). Defendants concede that plaintiff has exhausted this issue. In Grievance 14-01-0206-17i, plaintiff complained that Wilson failed to respond to his request for a cell change and that he was eventually assaulted by his cell mate, Miles. (*See* Dkt. 25, Ex. B-2). Defendants concede that plaintiff has exhausted this issue.

---

[1]    The court also noted that there was no reason that the motion could not simply be designated as a "motion to dismiss pursuant to 28 U.S.C. § 1997e(a)." The undersigned recognizes that there appears to be divergence in this court regarding this method of review as Judge Lawson has recently concluded that such a practice is not appropriate and legally unsupported. *See Anderson v. Jutzy*, 175 F. Supp. 3d 781, 788 (E.D. Mich. 2016). Regardless of the method utilized, however, the undersigned submits that the result would be the same.

In Grievance TCF-13-09-1894-28b, plaintiff complained at Step I that non-party Bergh failed to respond to his letter complaining about his discriminatory termination from his prison assignment. (*See* Dkt. 25, Ex. B-3). Plaintiff does not name any of the defendants in this grievance, despite the requirement that the names of all those involved in the issue being grieved be included. Additionally, plaintiff's Step I grievance was rejected as "vague." In fact, the Step I grievance was rejected and returned to plaintiff in accordance with PD 03.02.130 and OP 03.02.130. Deputy Warden Lori Gidley explained to plaintiff that his claim of wrongful termination was "moot without evidence." (Dkt. 25-3, Pg ID 141). Warden Gidley indicated that plaintiff needed to supply additional information if he wished to pursue this matter via the grievance process. (*Id.*) In the meantime, plaintiff's rejection was upheld at Steps II and III. (Dkt. 25, Ex. B-3). Courts in this circuit indicate that if the information in a grievance is too vague or imprecise, "a response so indicating would tell the interested parties that more detail is necessary." *McCloy v. Correction Med. Servs.*, 794 F. Supp. 2d 743, 749 (E.D. Mich. 2011). On the other hand, "when the prison officials address the merits of the prisoner's complaint without mentioning a problem identifying the object of the grievance, the administrative system has worked and the prison officials have had the 'opportunity to correct [their] own mistakes.'" *Id.* (quoting *Woodford*, 548 U.S. at 89) (internal citation and quotation marks omitted)). Here, it is clear that

prison officials did enforce procedural rules against the plaintiff and informed him of the deficiencies in his grievance. The plaintiff's failure to correct the identified deficiencies demonstrates a failure to exhaust the administrative remedies available to him. As such, plaintiff did not comply with the PLRA based on this grievance.

In Grievance TCF-13-03-1588-28i, plaintiff complained that he was terminated from his work assignment because he was found guilty of a misconduct violation but another inmate who was issued the same misconduct violation returned to his work assignment. (Dkt. 25-3, Ex. B-4). Plaintiff's Step I grievance was rejected for failure to attempt to resolve the issue prior to filing, and that rejection was upheld at Steps II and III. (*Id*.) Plaintiff responded to his Step I rejection arguing that any attempt to resolve the grievance would have been futile because MDOC staff laid him in on the date the misconduct was written; however, in subsequent appeal responses MDOC made clear that plaintiff had been found guilty at the initial misconduct hearing and that he had made no subsequent efforts to comply with the internal policy of attempting to resolve the issue with any staff member. (Dkt. 25-3, Pg ID 152) (*citing* Policy Directive 05.01.100). Because plaintiff failed to follow the proper procedures, this grievance does not exhaust plaintiff's corresponding complaint allegations. *See McCloy*, 794 F. Supp. 2d at 749.

2.    <u>Retaliation</u>

Plaintiff complains that his First Amendment rights were violated in two ways: first, plaintiff claims that after he was assaulted, defendants Schuhmacher and Wilson, as members of the Security Classification Committee, transferred him to the Handlon Correctional Facility ("MTU") as a form of retaliation to prevent him from returning to his prison work assignment as a music clerk and receiving back pay; second, plaintiff claims that defendants Glennie, Schuhmacher and Wilson terminated his prison job after he filed institutional grievances against them.

A prisoner retains First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974). Retaliation based on a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). To establish a First Amendment retaliation claim, a plaintiff must prove that: (1) the plaintiff engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that this adverse action was taken at least in part because of the exercise of the protected conduct. *Id*. It is insufficient that a right is clearly established in a generalized sense. That is because "the right the official

is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense." *Anderson v. Creighton*, 483, U.S. 635, 640 (1987).

With respect to the transfer allegation, even if plaintiff was engaged in protected conduct—here, the filing of grievances, the undersigned concludes that his complaint fails to allege an adverse action as that term applies in this context. The adverse action plaintiff alleges is his transfer from the Thumb Correctional Facility (TCF) to the Handlon Correctional Facility (MTU). Plaintiff does not allege, however, that the transfer resulted in an increase in his security level. Indeed, defendants confirm that plaintiff was a Level II prisoner at both facilities, and neither TCF nor MTU can be considered "disciplinary" prisons as neither facility has segregation cells. (Dkt. 25, Pg ID 82). A transfer to another prison at the same security level is not generally considered sufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights. *King v. Zamiara,* 150 Fed. Appx. 485, 494-495 (6th Cir. 2005); *Smith v. Yarrow*, 78 Fed. Appx. 529, 543 (6th Cir. 2003); *Mandela v. Campbell*, 1999 WL 357825, at *3 (6th Cir. 1999). Moreover, it is constitutionally permissible for prison officials to transfer an inmate to another facility to give prison staff a respite from his grievances. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Ward v. Dyke*, 58 F.3d 271, 274-275 (6th Cir. 1995)("Prisoners do not have a

constitutional right to be incarcerated in any particular institution.").

On the other hand, where there are aggravating factors, courts have been willing to find that a prison transfer would deter a person of ordinary firmness. *See Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005). For example, in *Siggers-El*, the aggravating factors accompanying the transfer included the loss of a high paying job needed to pay for the plaintiff's attorney (representing him in a direct appeal of his criminal conviction) and increased difficulties for the plaintiff's attorney in visiting with or representing the plaintiff because he was moved further away from her. *Id*. This limited exception applies "where there are foreseeable consequences to the transfer that would inhibit the prisoner's ability to access the courts." *Hix*, 196 Fed. Appx. at 358 (citing *Siggers-El v. Barlow*, 412 F.3d 693, 704 (6th Cir. 2005)). Where a prisoner alleges no such foreseeable consequences, however, the claim of retaliatory transfer must fail. *Id*. Because plaintiff did not allege that his job was necessary to pay for an attorney, or otherwise interfered with his right to access the courts, the undersigned finds that his transfer to the Handlon facility was not sufficiently adverse in this case.

With respect to plaintiff's work assignment, it has been noted in several cases that as a general rule, a prisoner has no constitutional right to a prison job or a particular prison program. *Tate v. Howes*, 2009 WL 1346621, *5 (W.D. Mich. 2009) (citing *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no

constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (Due Process Clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1995) (participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (no constitutional right to rehabilitative services); *Carter v. Morgan*, 1998 WL 69810, *2 (6th Cir. 1998) (no constitutional right to educational classes); *Tribell v. Mills*, 1994 WL 236499, *1 (6th Cir. 1994) ("[N]o constitutional right to vocational or educational programs")).  For this reason, plaintiff has no First Amendment right associated with his prison job.  In addition, the Court agrees with defendants that because they did not have the authority to remove plaintiff from his prison job, plaintiff's First Amendment claim should fail for this additional reason.  *See Shehee v. Luttrell*, 199 F.3d 295, 301 (6th Cir. 1999) (concluding that plaintiff failed to state a valid First Amendment claim against two prison officials because those officials "did not have the ability to terminate [plaintiff] from his commissary position.").[2]

---

[2]  In Count Three of his complaint, plaintiff also indicates that his retaliation theory is based on state law negligence; however, plaintiff has not developed this state law theory in his complaint, nor did he respond to the motion for summary judgment on this basis.  Because the

3.    Eighth Amendment

The court now turns to plaintiff's claimed need for protection and attendant claim under the Eighth Amendment. A "failure to protect" claim is analyzed under the Eighth Amendment deliberate indifference to safety standard. *See e.g.*, *Bishop v. Hackel*, 636 F.3d 757 (6th Cir. 2011). Under that standard, a prison inmate first must show that the failure to protect from risk of harm is objectively "sufficiently serious." *Id*. at 766 (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). That is, the inmate must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* Next, the inmate must show that the prison official was deliberately indifferent—that is, that the prison official knew of and disregarded an excessive risk to the inmate's health or safety; the official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and he must actually "draw the inference." *Id*. (quoting *Farmer v. Brennan*, 511 U.S. at 837).

Plaintiff is not entitled to a "comfortable" prison but he is entitled to a "humane" one. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). The treatment a prisoner receives in prison is subject to the limits of the Eighth Amendment. *Id.* Those limits require that prison officials take "reasonable measures" to provide for

_____

court concluded that no material issues remain on plaintiff's retaliation theory and because plaintiff did not develop his theory of negligent tort under Michigan law, the undersigned recommends his undeveloped state law negligence claim likewise be dismissed.

the safety of the prisoners.  *Id.*  Included in such "reasonable measures" is the duty

to "protect prisoners from violence at the hands of other prisoners."  *Id.* at 833.

The Eighth Amendment line is crossed when (1) a prisoner is incarcerated under

circumstances that pose a substantial risk of serious harm and (2) prison officials

proceed with deliberate indifference to the safety of the prisoner.  *Id.* at 834.  On

the continuum of conduct, deliberate indifference is something greater than mere

negligence and less than purposeful or knowing conduct—it is the "equivalent of

recklessly disregarding" a serious risk of harm to the prisoner.  *Id.* at 836.  The test

is a subjective one which requires proof that the prison official "acted or failed to

act despite [his or her] knowledge of a substantial risk of serious harm."  *Id.* at

842.  "To demonstrate deliberate indifference, an inmate must present evidence

from which a trier of fact could conclude 'that the official was subjectively aware

of the risk' and 'disregarded the risk by failing to take reasonable measures to

abate it.'"  *Sigers v. Bailey*, 2009 WL 2872811, at *3-4 (E.D. Mich. July 30,

2009), *report and recommendation adopted*, 2009 WL 2872814 (E.D. Mich Sept.

1, 2009); (citing *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (quoting

*Farmer*, 511 U.S. at 829)); *see also August v. Ratliff*, 2017 WL 461291 (E.D.

Mich. Feb. 3, 2017) (collecting cases).

Viewing the facts in the light most favorable to the non-moving party,

plaintiff was housed with a fellow prisoner who posed a risk of violent

confrontation with and physical harm to plaintiff. Furthermore, that risk was realized when plaintiff's cellmate attacked him, knocked him unconscious and left him with permanent damage to one of his arms. Defendants do not specifically address whether plaintiff suffered a serious harm in this case. Thus, it appears incontestible that the objective prong of the failure to protect claim -- i.e whether the risk of harm was sufficiently serious -- has been met.

Turning to the subjective component, the court must determine whether defendants Schuhmacher, Wilson and Hopkins were deliberately indifferent to the risk posed. The operative inquiry is whether these defendants knew that plaintiff faced a substantial risk of serious harm and whether they disregarded that risk by failing to take reasonable measures to abate it. Defendants maintain that they were not aware of any danger to plaintiff because the assault was a "sudden and isolated incident" which they had no prior knowledge was going to take place. Plaintiff, however, tells a different story. Specifically with respect to defendant Hopkins, plaintiff alleges that several times before June 1, 2013, he personally spoke to ARUS Hopkins about the "serious risk of possible harm between plaintiff and prisoner Miles." (Dkt. 1, ¶ 25). During these conversations, plaintiff alleges that he requested a cell change, but was informed that he needed RUM Wilson's approval. (*Id*.) Plaintiff says that despite these conversations, ARUS Hopkins failed to take any further steps to relieve the harm that plaintiff faced. With

respect to RUM Wilson, plaintiff says that it was Wilson's responsibility to classify prisoners before cell assignment and Miles was moved into his cell for the express purpose of assaulting him. Indeed, plaintiff alleges that shortly after his arrival, Miles informed plaintiff that he had a clandestine relationship with Wilson and shortly after that Miles began harassing plaintiff. (*Id*. ¶ 20). On November 5 and on December 21, 2013 he sent two separate kites to Wilson requesting a cell change because of the "unreconcilable hostilities between plaintiff and his cell mate." (*Id*. ¶ 27). Plaintiff alleges that RUM Wilson ignored plaintiff's requests for assistance. (Id. ¶ 28). For her part, Wilson says that she does not remember receiving plaintiff's November 5, 2013 kite; and did not read plaintiff's December 21, 2013 kite until January 3, 2014. (Dkt. 25-11, Pg ID 202). Wilson says that nothing in plaintiff's kite made her believe that plaintiff was in immediate danger of being assaulted by Miles, or any other prisoner, so she gave the kite to Hopkins to handle it. (*Id*.) On January 5, 2014, plaintiff was brutally attacked by his cell mate. (*Id*. ¶ 29). When he "came to," prisoner Miles allegedly exclaimed that "she (G. Wilson) told me to do this." (*Id*.) Plaintiff has supported his version of events - including the level of knowledge as well as the actions and/or inaction of both Wilson and Hopkins - with, amongst other things, a declaration from himself and affidavit another inmate - Mario Gillespie. (Dkt. 29, Pg ID 251-256, 270-288). Indeed, inmate Gillespie's affidavit alleges that plaintiff's cellmate communicated

his intention to do harm to plaintiff some three days before the subject attack. (*Id.* at Pg ID 273). Taken as a whole, the undersigned concludes unresolved issues of material fact remain regarding plaintiff's Eighth Amendment claim as to RUM Wilson and ARUS Hopkins. With respect to defendant Schuhmacher, however, the undersigned has thoroughly reviewed the pleadings and finds no issues of material fact that remain. Thus, defendants' motion should be denied as to Wilson and Hopkins, but granted as to Schumacher on the Eighth Amendment claim.

### 4.    Qualified Immunity

All MDOC defendants request an order in their favor based on qualified immunity; however, as set forth above the undersigned has concluded, viewing the facts in the light most favorable to plaintiff, that the only constitutional issue that remains is on plaintiff's Eighth Amendment claim as to Hopkins and Wilson.

As acknowledged by the defendants, the Sixth Circuit employs a three-part inquiry to determine whether a government official is entitled to qualified immunity, which asks: (1) whether a constitutional violation has occurred; (2) whether the right that was violated was a clearly established right of which a reasonable person would have known; and (3) whether the plaintiff has alleged sufficient facts, and supported the allegations with sufficient evidence to indicate that the officials' actions were unreasonable in light of the clearly established

constitutional rights. *Saucier v. Katz,* 533 U.S. 194, 201-202 (2001*); Higgason v. Shephens*, 288 F.3d 868, 876-877 (6th Cir. 2002); *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999). Given the foregoing conclusion that there remain questions of fact pertaining to plaintiff's Eighth Amendment claims against defendants Hopkins and Wilson, the undersigned cannot say that defendants are entitled to qualified immunity. *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989) (When "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," the "jury becomes the final arbiter of [a] claim of immunity."); *Bouggess v. Mattingly*, 482 F.3d 886, 888 (6th Cir. 2007). Given the foregoing recommendations regarding the claims against the other moving defendants, the issue of qualified immunity need not be further addressed.

## IV. RECOMMENDATION

For the above stated reasons, the undersigned **RECOMMENDS** that defendants' motion for summary judgment (Dkt. 25) be **GRANTED IN PART** and **DENIED IN PART**. More specifically,

The undersigned **RECOMMENDS** that defendants Glennie and Schuhmacher be **DISMISSED WITH PREJUDICE**.

The undersigned also **RECOMMENDS** that plaintiff's First Amendment claims be **DISMISSED** in their entirety.

The undersigned also **RECOMMENDS** that Count III (Retaliation/ Negligent Tort) be **DISMISSED** in its entirety.

The undersigned also recommends that plaintiff's Eighth Amendment Claim be **DISMISSED** as to defendant SCHUMACHER ONLY.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and E.D. Mich. Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2); E.D. Mich. Local Rule 72.1(d). The response must specifically address each issue raised in the

objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc.  If the Court determines that any objections

are without merit, it may rule without awaiting the response.

Date: August 11, 2017                          s/Stephanie Dawkins Davis
                                               Stephanie Dawkins Davis
                                               United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on <u>August 11, 2017</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record and that I have mailed by United States Postal Service to the following non-ECF participant: <u>J.T. Sutton, #206240, Ionia Maximum Correctional Facility, 1576 W. Bluewater Highway, Ionia, MI 48846.</u>

s/Tammy Hallwood
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov