UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JT SUTTON,

                Plaintiff,

v.

GLENNIE, *et al.*,

              Defendants.

_____/

Case No.: 16-10949

Linda V. Parker
United States District Judge

Stephanie Dawkins Davis
United States Magistrate Judge

**REPORT AND RECOMMENDATION**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 64)**

## I.  PROCEDURAL HISTORY

Plaintiff J.T. Sutton, who is currently confined at the Ionia Correctional Facility, filed a prisoner civil rights complaint on May 15, 2016, against MDOC defendants Blaise Glennie, Lance Schuhmacher, Geraldine Wilson, and Arlinda Hopkins, for actions that occurred while he was confined at the Thumb Correctional Facility (TCF).  (Dkt. 1).  Plaintiff brings claims under the First, Eighth and Fourteenth Amendments to the United States Constitution, together with a state law negligence claim.  (*Id.* at Pg ID 3-4).  On May 4, 2016, District Judge Linda V. Parker entered an Order referring all pretrial matters to the undersigned.  (Dkt. 8).  In a report and recommendation on all four defendants' motion for summary judgment, the undersigned recommended that Sutton's First Amendment retaliation claims and his retaliation/negligent tort claim be dismissed,

and further recommended that defendants Schumacher and Glennie be dismissed. (Dkt. 31, pp. 24-25). The Court adopted the report and recommendation. (Dkt. 34). In its Case Management Orders following the Court's ruling, the Court allowed for the filing of additional dispositive motions after the close of discovery. (Dkts. 43, 52). Remaining defendants Wilson and Hopkins (hereinafter "defendants") have since filed another motion for summary judgment on the remaining issue: Sutton's Eighth Amendment failure to protect claim. (Dkt. 64). The motion is fully briefed and ready for report and recommendation.

For the following reasons, the undersigned **RECOMMENDS** that defendants' motion for summary judgment (Dkt. 64) be **GRANTED IN PART, DENIED IN PART**, and that defendant Hopkins be dismissed from this case.

## II.    FACTUAL BACKGROUND

During the time relevant to the allegations in the complaint, Sutton was incarcerated with MDOC at the Thumb Correctional Facility (TCF). (Dkt. 64-2, Preliminary Examination Testimony, Pg ID 493). Defendant Wilson was a Resident Unit Manager (RUM) at TCF (Dkt. 25-11, Pg ID 201-02 – Wilson Affidavit)[1] and defendant Hopkins was an Assistant Resident Unit Supervisor (ARUS) at TCF (Dkt. 25-13, Pg ID 225-26 – Hopkins Affidavit). In the Spring of

---

[1] In the motion at bar both defendants rely on their affidavits submitted as exhibits to their first motion for summary judgment at docket no. 25.

2013 another prisoner, Chanton Miles, transferred into Sutton's cell as his cellmate. (Dkt. 1, Complaint, ¶ 19, 23; Dkt. 25-11, ¶ 6-7). Before and after June 1, 2013, Sutton personally spoke with Hopkins about obtaining a cell change. (Dkt. 1, ¶ 25, 26; Dkt. 25-13, ¶ 4-5). Hopkins informed him that he would need to get Wilson's approval first according to MDOC rules. On December 21, 2013, Sutton sent a letter, or kite, to Wilson requesting a cell change. (Dkt. 1, ¶ 28; Dkt. 25-11, ¶ 9-12). A little over two weeks later, on January 5, 2014, Miles assaulted Sutton in his cell. (Dkt. 1, ¶ 29). Miles used an object that cut Sutton's head, permanently restricting the vision in his left eye, and he used a chair against his left his left arm leaving the arm permanently disfigured. (Dkt. 1, ¶ 29; Dkt. 64-2, Pg ID 497). According to Sutton, when he regained consciousness while Miles was beating him with the chair, Miles said "she (G. Wilson) told me to do this."[2] (Dkt. 1, ¶ 29).

In his grievance relating to the assault, Sutton states that Wilson knew that Miles was violent and has a history of past assaultive behavior, that prison records show Miles' history of past assaultive behavior, and that Wilson and Hopkins should have taken steps to keep him from harm. (Dkt. 25-3, Pg ID 121). Plaintiff does not direct the Court to any evidence substantiating the assertions in his grievance that Wilson and/or Hopkins knew of Miles' alleged history of assaultive

---

[2] Wilson does not contest that this statement was made.

behavior.  The Step I response to this grievance contains information from the investigation into the allegations.  According to the prison official responding to Sutton's grievance, Sutton sent a letter to Wilson on December 21, 2013 requesting a cell change.  Wilson stated that due to an ice storm she was in the building for only an hour on December 23, 2013 and out of the building the rest of the time between December 23, 2013 and January 2, 2014.  (Dkt. 25-3, Pg ID 125, Dkt. 25-11, ¶ 10).  The grievance response and her earlier affidavit indicate that when Wilson returned to the building, she read the kite and passed it on to Hopkins on Friday, January 3, 2014.  According to the grievance response Hopkins said she called Wilson and discussed Sutton's letter that same day.  Hopkins had Sutton paged to her office around 4:30pm that day, but Sutton was at work.  Hopkins stated that she intended to call Sutton again on Monday, January 6, 2014.  On Monday, January 6th, Hopkins learned that Sutton and Miles were in segregation.  (*Id.*).

The defendants offer an MDOC Presentence Investigation "Agent's Description of the Offense" which recounts information from a Michigan State Police report by Trooper Lentine dated January 5, 2014 about the altercation.  (Dkt. 65).  The agent also summarized Sutton's victim impact statement as follows: "The victim states he was assaulted for no reason and states he feels that

defendant [Miles] picked him because was older and vulnerable.  The victim also indicates there was no verbal altercation before the offense." (*Id.*).

In addition to his verified complaint and subsequent declaration, Sutton provides an affidavit from another prisoner, Mario Gillespie-Borck to support his version of events.  (Dkt. 29, Pg. ID 272, Exhibit A – Affidavit).  Gillespie-Borck states that he was housed at TCF during the events recounted in Sutton's complaint.  (*Id.* at Pg ID 272, ¶ 3).  He states that on December 19, 2013, he was in Hopkins' office with Sutton, and he heard Sutton ask to change his cell because Sutton and Miles were possibly going to get into a serious fight.  According to Gillespie-Borck, Hopkins explained that Sutton needed to get permission from Wilson.  Gillespie-Borck further states that on January 2, 2014, he was walking with Miles when Miles approached Wilson asking for a cell change because he and Sutton were not getting along.  (*Id.* at Pg ID 273, ¶ 4).  Wilson told Miles to send a kite.  Miles responded, "If I beat his old ass, I bet you'll move him then."  Wilson allegedly replied, "you do what you have to do."  According to Gillespie-Borck, he and Miles were left with the impression that Wilson wanted Miles to attack Sutton. Gillespie-Borck also states that Miles told him that he had "history" with Wilson. (*Id.* at ¶ 5).  Neither defendant directly addresses or specifically challenges the facts set forth in this affidavit.  However, as stated above, Hopkins acknowledged receiving requests for a cell change from Sutton but insists that she did not

perceive a threat of harm to Sutton from Miles.    Similarly, Wilson denies that she perceived any risk of harm to Sutton based on Sutton's kite. (Dkt. 25-11, ¶12).

The parties advance vastly different versions of events.  As an initial matter, they disagree on when Miles moved into Sutton's cell.  Sutton says he moved in on or about April 15, 2013 (Dkt. 1, ¶ 23), while Wilson says he was transferred to TCF on May 23, 2013 (Dkt. 15-11, ¶ 7).[3]  Further, Sutton insists Miles was moved into his cell for the purpose of assaulting him for writing grievances.  (Dkt. 1, ¶ 19).  He says that shortly after moving in, Miles informed Sutton that he had a personal relationship with defendant Wilson and he began harassing Sutton soon after his arrival.  (*Id.*).  After November 15, 2013, Sutton claims he began receiving intensified threats and harassment from Miles relating to grievances that he had written against Wilson.  (Dkt. 1- Complaint, at ¶ 22).  In his declaration in response to defendants' motion for summary judgment, Sutton states that Wilson and Hopkins "both received active and constructive notice of the harassment and failed to take any meaningful measures to alleviate the threat of substantial possibility that a violent fight would occur[]."  (Dkt. 71, Pg ID 535).  He also states that his declaration shows that he was subjected to a hostile living environment that forced him to live with a hostile, intimidating, and offensive cell mate and that the defendants knew of the "harassments and violent interactions" between the two

---

[3] The date on which Miles moved in does not appear to be material.

6

men, yet failed to take meaningful action.  (Dkt. 71, Pg ID 540).  In his complaint, he states that he told the defendants about "unreconcilable hostilities" between the two, that they needed to be separated immediately to avoid significant harm to himself, and that Miles told Sutton that Wilson instructed Miles to attack him. (Dkt. 1, ¶¶ 27-28).

Regarding his requests to Hopkins for a cell change, Sutton says that June 1st of every year was the official cell change day at TCF.  (Dkt. 1, ¶ 24).  He says that on several occasions before and after June 1, 2013, he spoke personally with Hopkins about the serious risk of harm between himself and Miles.  (*Id.* at ¶¶ 25, 26).  According to Sutton, Hopkins told him that she was not in charge of assignment changes and that he would have to send a kite to Wilson.  Sutton says that Hopkins failed to take any steps to relieve the substantial risk of harm.  (*Id.*). Hopkins explains that, at that time, TCF permitted voluntary cell changes every six months for inmates who are misconduct free.  (Dkt. 25-13, ¶ 5).  Because Sutton was not eligible for a move at the time of his request, Hopkins told him he would need to obtain Wilson's approval first.  She says that "[a]t no time did Sutton inform me that he was threatened or needed protection from his cellmate, prisoner Miles."  (*Id.* at ¶ 6).

Sutton sent a kite to Wilson on November 5, 2013, informing her of the "dire need to change cells because of unreconcilable hostilities between plaintiff

7

and his cell mate." (Dkt. 1, ¶ 27).  He says that in his December 21, 2013 letter to Wilson he warned her that he and Miles needed to be separated immediately because of a risk of serious harm, but Wilson ignored all of his requests and never responded.  (Dkt. 1, ¶ 28).

For her part, Wilson says that she had no part in transferring Miles to TCF or to Sutton's cell.  (Dkt. 25-11, ¶ 6-7).  She also says that the allegation that Miles was moved into the cell for the purpose of assaulting Sutton for filing grievances is false.  As to the November 5, 2013 kite, Wilson has no recollection of receiving the kite.  (*Id.* at ¶ 8).  And regarding the December 21, 2013 letter, Wilson explains that the 21st was a Saturday and she did not work Saturdays.  (*Id.* at ¶ 10).  She did not return to the prison and did not read Sutton's kite until her return from vacation on January 3, 2014.  (*Id.* at ¶ 11).  She says that nothing in his kite requesting a cell change led her to believe that Sutton was in immediate danger of being assaulted by Miles or any other prisoner.  (*Id.* at ¶ 12).  She gave the letter to Hopkins and asked her to address and resolve the matter.  (*Id.* at ¶ 13).

The defendants posit that Sutton's sworn testimony from Miles' preliminary examination hearing on the assault contradicts his complaint allegations and December 21, 2013 kite to Wilson.  At the hearing, Sutton testified that on January 5, 2014, he was in his cell with Miles.  (Dkt. 64-2, Pg ID 494).  Miles started an altercation about the floor being wet.  Sutton said that after Miles first hit him he

8

must have been knocked unconscious, because when he came to, he was lying on his back and Miles hit his arm with a chair.  (*Id.* at Pg ID 495).  Sutton was asked, "You just calmly was [sic] in that cell and he just assaulted you with no reason at all, right?"  Sutton replied, "No reason at all.  We've never been in an argument, never.  Never had any misunderstandings or nothing."  (*Id.* at Pg ID 499).  According to Sutton, however, his answer was about that day, meaning he and Miles did not have an argument *that day*, January 5, 2014.  (Dkt. 71, at p. 2-3).

## III.   ANALYSIS AND RECOMMENDATIONS

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d

433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario*, *Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Such a determination requires that the Court "view the evidence presented through

the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254.

Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of

the evidence, on a motion for summary judgment the Court must determine

whether a jury could reasonably find that the plaintiff's factual contentions are true

by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving

party fails to make a sufficient showing on an essential element of its case with

respect to which it has the burden of proof, the movant is entitled to summary

judgment. *Celotex*, 477 U.S. at 323. The Court must construe Rule 56 with due

regard not only for the rights of those "asserting claims and defenses that are

adequately based in fact to have those claims and defenses tried to a jury," but also

for the rights of those "opposing such claims and defenses to demonstrate in the

manner provided by the Rule, prior to trial, that the claims and defenses have no

factual basis." *Id*. at 327.

     B.   <u>Discussion</u>

     A "failure to protect" claim is analyzed under the Eighth Amendment

deliberate indifference to safety standard. *See e.g., Bishop v. Hackel*, 636 F.3d 757

(6th Cir. 2011). Under that standard, a prison inmate first must show that the

failure to protect from risk of harm is objectively "sufficiently serious." *Id*. at 766

11

(quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).  That is, the inmate must show that "he is incarcerated under conditions posing a substantial risk of serious harm."  *Id*.  Next, the inmate must show that the prison official was deliberately indifferent—that is, that the prison official knew of and disregarded an excessive risk to the inmate's health or safety; the official must both be "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists" and he must actually "draw the inference."  *Id*. (quoting *Farmer v. Brennan*, 511 U.S. at 837).

The Supreme Court has determined that any given prisoner is not entitled to a "comfortable" prison but is entitled to a "humane" one.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Thus, the treatment a prisoner receives in prison is subject to the limits of the Eighth Amendment.  *Id*.  Those limits require that prison officials take "reasonable measures" to provide for the safety of the prisoners.  *Id*.  Included in such "reasonable measures" is the duty to "protect prisoners from violence at the hands of other prisoners."  *Id*. at 833.  The Eighth Amendment line is breached when (1) a prisoner is incarcerated under circumstances that pose a substantial risk of serious harm and (2) prison officials proceed with deliberate indifference to the safety of the prisoner.  *Id*. at 834.  On the continuum of conduct, deliberate indifference is something greater than mere negligence and less than purposeful or knowing conduct—it is the "equivalent of recklessly disregarding" a

serious risk of harm to the prisoner.  *Id*. at 836.  The test is a subjective one which requires proof that the prison official "acted or failed to act despite [his or her] knowledge of a substantial risk of serious harm."  *Id*. at 842.  "To demonstrate deliberate indifference, an inmate must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregarded the risk by failing to take reasonable measures to abate it.'"  *Sigers v. Bailey*, 2009 WL 2872811, at *3-4 (E.D. Mich. July 30, 2009), *report and recommendation adopted*, 2009 WL 2872814 (E.D. Mich. Sept. 1, 2009); (citing *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (quoting Farmer, 511 U.S. at 829)); *see also August v. Ratliff*, 2017 WL 461291 (E.D. Mich. Feb. 3, 2017) (collecting cases).

In considering the defendants' motion for summary judgment, the Court is confronted with competing sworn testimony and affidavits.  The defendants argue that Sutton's statements in his verified complaint are contradicted by his prior sworn testimony and his written kite to defendant Wilson.  As a result, they insist that no reasonable jury could believe Sutton's account of the facts in the verified complaint.  (Dkt. 73, at p. 3-6).  The undersigned agrees that no reasonable jury could credit Sutton's account under these circumstances.  See *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). However, Sutton does not rely solely on his own account of events. He also relies on the affidavit of Gillespie-Borck and evidence in the record such as his kite. This evidence, and other items in the record discussed below demonstrate the existence of a genuine issue of material fact that remains.

Before addressing the pending motion for summary judgment, the undersigned will first explain the differences between the motion at bar and the prior motion for summary judgment filed in September 2016 (Dkt. 25) and decided on in August 2017 (Dkts. 31, 34). In their previous motion, the defendants[4] relied on their respective affidavits in arguing that they did not violate Sutton's Eighth Amendment right to protection in the prison. (Dkt. 25). Also before the Court were Sutton's kite to Wilson, his verified complaint, and declarations from Sutton and Gillespie-Borck. The undersigned concluded that the objective prong was satisfied because the risk of serious harm to Sutton was satisfied when Miles attacked Sutton, knocking him unconscious and leaving him with permanent damage to one of his arms Defendants did not argue otherwise. (Dkt. 31, at p. 21). Further, based on the competing sworn statements before the Court at that time, the undersigned concluded that there were unresolved issues of material fact on the

---

[4] Wilson, Hopkins, and dismissed defendants Glennie and Schuhmacher.

subjective prong of the claim—a recommendation adopted by the Court.  (Dkt. 31, at p. 23; Dkt. 34).

Now having had the benefit of a full period of discovery, defendants again do not contest that the objective prong is satisfied.  Because the facts of the assault have not changed, and the objective prong is not contested, the undersigned again concludes that the risk of harm is objectively sufficiently serious.  With the benefit of the additional evidence discussed below, the defendants argue only that there is insufficient evidence to establish a material dispute as to whether they acted with deliberate indifference to a substantial risk of serious harm.

In addition to the evidence brought forth in the first motion for summary judgment, the defendants have now added Sutton's testimony from Miles' preliminary examination in March 2014 (about three months after the assault), his January 5, 2014 (the day of the assault) victim impact statement as summarized in Miles' presentence investigation report, and portions of Miles' deposition testimony from this case.[5]  (Dkt. 64).

---

[5] In his deposition, Miles says that, while he and Sutton were not friends, there were never any arguments or problems between the two men before the assault.  (Dkt. 73-1, Deposition Transcript).  The undersigned will not consider this evidence as it was brought forth for the first time in defendants' reply brief (Dkt. 73, at p. 3-4) without an opportunity for Sutton to address the new evidence.  *See Seay v. TVA,* 339 F.3d 454, 480–82 (6th Cir. 2003) ("When new submissions and/or arguments are included in a reply brief, and a non-movant's ability to respond to the new evidence has been vitiated, a problem arises with respect to Federal Rule of Civil Procedure 56(c).").

On the record evidence, no reasonable jury could credit Sutton's statements in his verified complaint and declaration. In drawing this conclusion, the undersigned is cautious not to invade the province of the jury. As this Court has stated,

> The Court is well aware that juries, not judges, determine the credibility of witnesses. *See Dawson v. Dorman*, 528 Fed. Appx. 450, 452 (6th Cir. 2013). But it is equally true that when a party moves for summary judgment, the judge's job is to decide whether there is a genuine dispute for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). And this Court would be doing that job poorly if it required six to eight people to spend a week in a jury box when there is only one rational result. *See Matsushita*, 475 U.S. at 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"); *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986) ("[T]here must be evidence on which the jury could reasonably find for the plaintiff."). Indeed, on facts strikingly similar to those in this case (more on that below), the Second Circuit explained: "[I]n the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' *Anderson*, 477 U.S. at 252, and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). So this Court does have "some discretion to determine whether [Sutton's] claim is implausible." *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1088 (6th Cir. 1996) (internal quotation marks omitted).

*Gallmore v. York*, 2018 WL 1737120, at *5 (E.D. Mich. Apr. 11, 2018).  Here,

there are a number of reasons that no reasonable jury could credit Sutton's account

as set out in his verified complaint and declaration.

The primary failing is that Sutton's declaration and verified complaint

contradict his own prior sworn testimony.  It is well-established that a party cannot

create an issue of fact to survive summary judgment by offering affidavit

testimony that conflicts with prior sworn testimony.  *Aerel, S.R.L. v. PCC Airfoils,*

*L.L.C.,* 448 F.3d 899 (6th Cir. 2006) (citing *Cleveland v. Policy Mgmt. Sys.*

*Corp.,* 526 U.S. 795 (1999) ("As the Supreme Court has observed, the lower

federal courts have held with virtual unanimity that a party cannot create a genuine

issue of fact sufficient to survive summary judgment simply by contradicting his or

her own previous sworn statement (by, say, filing a later affidavit that flatly

contradicts that party's earlier sworn deposition) without explaining the

contradiction or attempting to resolve the disparity.").  A verified complaint carries

the same weight as an affidavit for purposes of responding to a motion for

summary judgment.  *El Bey v. Roop,* 530 F.3d 407, 414 (6th Cir. 2008) (citing

*Lavado v. Keohane,* 992 F.2d 601, 605 (6th Cir. 1993) (explaining that where a

party files a verified complaint, the allegations contained therein "have the same

force and effect as an affidavit for purposes of responding to a motion for summary

judgment" (internal quotation marks omitted)); *Mooring v. San Francisco Sheriff's*

17

*Dep't*, 289 F. Supp. 2d 1110, 1115 (N.D. Cal. 2003) ("A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.) (citing *Schroeder v. McDonald,* 55 F.3d 454, 460 & nn. 10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge)).  The court may disregard the subsequent affidavit unless a party gives a legitimate reason for the discrepancy.  *See Penny v. United Parcel Service,* 128 F.3d 408, 415 (6th Cir. 1997) (party cannot create a genuine issue of material fact by filing an affidavit after summary judgment has been made, that contradicts the earlier deposition testimony); *Dotson v. U.S. Postal Service,* 977 F.2d 976, 978 (6th Cir.), *cert. denied,* 506 U.S. 892, (1992) (party cannot rely upon an affidavit contradicting prior sworn testimony); *Reid v. Sears, Roebuck and Co.,*790 F.2d 453, 460 (6th Cir. 1986).

Here, Sutton's statements cannot be reconciled and the Court should not credit Sutton's statements in his declaration and verified complaint that contradict his prior testimony.  Sutton says that Wilson and Hopkins "both received active and constructive notice of the harassments and failed to take any meaningful measures to alleviate the threat of substantial possibility that a violent fight would

18

occur[]," (Dkt. 71, Pg ID 535), and that they knew of the "harassments and violent interactions" between the two men, yet failed to take meaningful action.  (*Id.* at Pg ID 540).  In his complaint, as recounted above, he states that he told the defendants about "unreconcilable hostilities" between the two, that they needed to be separated immediately to avoid significant harm to himself, and that Miles told Sutton that Wilson instructed Miles to attack him.  (Dkt. 1, ¶¶ 27-28).  Yet, contrary to his declaration statements provided in March 2016 (his complaint) and November 2018 (his response to the instant motion for summary judgment), he testified at Miles' preliminary examination in March 2014 that the two men *never* had any arguments or misunderstandings; that the attack happened for no reason at all.  Specifically, Sutton said that Miles attacked him for "No r[e]ason at all. We've never been in an argument, never.  Never had any misunderstandings or nothing."  (Dkt. 64-2, Preliminary Exam Transcript, at p. 10).  Sutton did not limit or qualify his answer limiting it to the day of the assault as he now offers, and his response is clear that he was addressing his history with Miles, not just the day of the attack.  This testimony pointedly contradicts his later statements that he was threatened by Miles in the months before the assault and he feared an impending attack by Miles.  Rather than fearing an attack because of hostility from Miles, Sutton's unambiguous testimony is that there were no hostilities and the attack happened for no reason.  Because Sutton has attempted to contradict his own prior

19

sworn testimony with later verified statements, the Court should not credit the later

verified statements.

Second, no reasonable jury could credit Sutton's statements about prior

hostilities on this record.  In addition to Sutton's preliminary examination

testimony that he and Miles never had any problems before the assault and that the

assault happened for no reason, Sutton's kite to Wilson indicates that he and Miles

did not have issues that would pose a significant threat of harm.  This evidence

leads to the conclusion that Sutton did not advise the defendants of a substantial

threat of serious harm to Sutton.  Indeed, Sutton's December 21, 2013 letter to

Wilson gives no indication that Sutton and Miles ever had any violent interactions

or that Miles ever threatened Sutton's personal safety.  In this kite, Sutton says that

he desperately needed to be separated from his cellmate Miles.  (Dkt. 25-11, Pg ID

210).  He explains that he has a mental condition in remission which could cause

him, Sutton, to "very easily snap" if frightened out of his sleep or awakened

violently.  He says that Miles "is not a bad person" but is disrespectful and noisy,

coming into the cell while Sutton is sleeping and startling him by finishing a

conversation, turning on the light, or going through his property.  When Sutton is

awakened in this manner, he is left angered and unable to go back to sleep.  (*Id.*).

He also states in the kite that he spoke to Hopkins about a cell change for which he

had been waiting since March 2013.  Finally, he advises that he is requesting the

20

cell change before "the situation turns unfriendly." (*Id.*). This kite does not suggest a risk of substantial harm from an attack by Miles. If anything, it suggests that Sutton may harm Miles where he says that (1) he may "snap" if awakened at night; and (2) he is seeking a cell change before the situation turns unfriendly. Regarding the latter, Sutton implies that the situation is not yet unfriendly – less than a month before the assault. Even reading this kite in the light most favorable to Sutton, it does not provide facts from which to infer a substantial risk of serious harm to Sutton, but rather supports Wilson's sworn statement that the kite did not lead her to believe that Sutton was in danger. This evidence does not demonstrate that the defendants were deliberately indifferent to a substantial risk of serious harm to Sutton at the hands of cellmate Miles. *See Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) (Granting summary judgment where the plaintiff's litigation position was developed many months after the events giving rise to the complaint and was contradictory to his three more contemporaneous accounts); *Burnette v. Kennamore*, 606 F. Supp. 2d 827 (W.D. Tenn. 2009) (Concluding that no reasonable jury could find in plaintiff's favor where verified complaint and amended complaint were contradicted by prior sworn testimony and other more contemporaneous evidence); *Gallmore*, 2018 WL 1737120 (E.D. Mich. Apr. 11, 2018) (Finding no rational jury could credit the plaintiff's litigation account where it was contradicted by a number of contemporaneous statements).

The question then becomes whether there is sufficient evidence remaining in the record to establish a genuine issue of material fact for trial. As discussed, Sutton's claims of having communicated a serious risk of harm to Wilson and Hopkins is undermined by his prior testimony and statement proffered during Miles' preliminary examination. Thus, to support his claims, Sutton is left with (1) the undisputed fact that he authored two kites (one of which the defendants saw) requesting a cell transfer relating to circumstances, albeit not violent, within his cell; (2) after reading Sutton's Kite on January 3, 2014, Wilson's only action was to forward the kite to Hopkins; and (3) Gillespie-Borck's affidavit in which he claims that (a) Miles told Wilson that Sutton needed to be transferred out of their cell; (b) Miles posed a hypothetical suggesting that he could trigger the transfer by physically assaulting Sutton; (c) Wilson told Miles to "do what [he] had to do" – a phrase that the two men took as a blessing for Miles to carry out the assault; and (d) he witnessed Sutton tell Hopkins that he needed to be transferred to avoid a violent encounter with Miles. The undersigned concludes that even without Sutton's statements about apprising officials of a serious risk of harm, there remains a material issue of fact on this record as to whether defendant Wilson perceived and ignored a serious risk of harm.

As stated, Wilson does not contest Gillespie-Borck's affidavit. To review, Gillespie-Borck declares that on January 2, 2014, Sutton's attacker – Miles – told

Wilson he wanted a cell change because he wasn't getting along with Sutton.  And, when Wilson told Miles to send a kite, Miles responded to Wilson, "If I beat his old ass, I bet you'll move him then" to which Wilson allegedly replied, "you do what you have to do."  This left Gillespie-Borck and Miles with the firm impression that Wilson wanted Miles to attack Sutton.  (Dkt. 29, at ¶ 5).  Gillespie-Borck's affidavit evokes parallels to the Sixth Circuit's decision in *Street v. Corrections Corp. of Am.*, 102 F.3d 810 (6th Cir. 1996).  In that case, the plaintiff, Street, was physically assaulted by another inmate, Harris.  *Id.* at 812.  Relevant to this case, Street brought suit against a corrections officer, Stephen, for deliberate indifference under the Eighth Amendment.  Earlier in the day of the attack, Street and Harris had gotten into an argument and Harris threatened violence.  A corrections officer working during that shift heard the argument, stopped it, and reported it to the Senior Correctional Officer.  Street later told that corrections officer that he would "whip" Harris.  *Id.*  Defendant Stephen later replaced that corrections officer at shift change.  The corrections officer told Stephen that Street and Harris had "gotten into it."  *Id.*  Stephen was the only officer assigned to watch the unit in which Street, Harris, and 72 other inmates were housed.  *Id.*  According to Stephen, after the shift change Harris asked him either, "What would you do if I kicked [Street's] ass?" or "What would you do if I knock [Street] out?"  Stephen told Harris that if he witnessed such an incident, it would be reported, and Harris

would be placed in isolation.  *Id.* at 812-13.  Stephen stated that, simultaneous with this conversation, he opened all the doors in the unit from a control panel.  *Id.* at 813.  He could tell from a sensor that Street's door had been reclosed.  Harris attacked Street at that time, leaving Street with a lacerated eye and other injuries. *Id.*  The court held that there was an issue of fact as to whether Stephen was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and whether he actually drew the inference based on the question Harris asked him.  *Id.* at 816.  Stephen testified that he did not feel that the question from Harris indicated a "threat to Street's safety."  *Id.*  Stephen also stated in an affidavit that he was reckless with regard to Street's safety by not keeping Harris away from him, but that Stephen did not intentionally strive to harm Street. *Id.*  On these facts, the court concluded that there was a genuine issue of material fact as to whether Stephen was deliberately indifferent to a substantial risk of harm to Street.  *Id.* at 817.

Here, according to Gillespie-Borck, Miles asked Wilson a similar question to that asked by Harris in *Street*: "If I beat his old ass, I bet you'll move him then" after expressly asking for a cell change.  (Dkt. 29, Pg ID 273).  Unlike officer Stephen in the *Street* case who indicated that he would report the hypothetical attack posed to him by the attacking inmate, Wilson reportedly replied, "you do what you have to do."  And though the facts in *Street* included a fact not present

here, i.e. that shortly after Harris's statement to Stephen, Stephen opened all the
cell doors and noticed that Street's was reclosed, that factual difference creates an
insufficient distinction since here.  Wilson knew that absent a separation Miles
would assuredly return to the same locked cell as Sutton after having posed the
possibility of beating him.   Moreover, it is undisputed that Wilson knew from
Sutton's kite that there was a risk of violence between the two men, albeit from
Sutton's statement that he might "snap" rather than any suggestion of Miles'
snapping.  But, she also knew that this potential for violence was why Sutton was
requesting a move.  And she knew that Sutton was substantially older than Miles,
arguably rendering him more vulnerable to attack.  Indeed, Miles allegedly referred
to Sutton's old age in his query to her and the presentence investigation report
summary indicates that there is a 30-year difference between the two men.  (Dkt.
65, Pg ID 516).  Yet, when later presented with information from the potential
trigger for Sutton's fear of snapping (i.e. Miles) that he too wanted to move and
was asking about what would happen if he attacked Miles, she responded with
what at least one listener – Gillespie-Borck – perceived to be a blessing to do just
that.  She responded by passing the kite to Hopkins to address and resolve the
matter[6] without any apparent disclosure of Miles' statements to her.  Like Stephen,

---

[6] The record does not appear to contain any facts regarding what information Hopkins
received at this juncture beyond what is contained in the kite given to Hopkins when Wilson
passed the kite on to her.

Wilson says that she did not perceive any serious threat to Sutton's safety.  Though she does not admit recklessness like Stephen did in *Street*,[7] a reasonable jury could conclude that she acted with deliberate indifference to Sutton's safety in failing to take additional actions on the information before her.

In the view of the undersigned, there are genuine issues of fact for the jury to decide  whether Miles' question about attacking Sutton was a threat to Sutton's safety, what Wilson's purported retort to "do what you have to do" meant, whether Wilson was then aware of facts from which an inference could be drawn that that a substantial risk of serious harm existed, whether merely passing the request to transfer to Hopkins shows that she actually drew the inference, and whether, by merely passing the request on, Wilson disregarded the risk of harm.  This is especially so considering Wilson had knowledge of the substantial age difference between the two men.  (Dkt. 65, Pg ID 516).

On the other hand, there appears to be no material issue of fact as to whether Hopkins was deliberately indifferent to a serious risk of harm.  Gillespie-Borck says that he overheard Sutton speaking with Hopkins about a room change.  Specifically, Sutton told Hopkins that he and Miles "were quite possibly going to

---

[7] Although Stephen admitted recklessness in his affidavit, unlike Wilson in this case, it does not appear that the Sixth Circuit found a question of fact on the issue of deliberate indifference based on this admission.  Rather, it appears that the basis for the holding was, in large part, Stephen's knowledge of the hypothetical question and opening the cell doors, which allowed the aggressor to attack Street.

get into a serious fight." (Dkt. 29, Pg ID 272). After being asked for a cell change, he heard Hopkins inform Sutton that he would need to request the change from defendant Wilson.

The statement that Sutton and Miles were possibly going to get into a serious fight does not itself indicate that Sutton feared for his safety, nor does it suggest that Miles intended to attack Sutton. Indeed, these facts from Gillespie-Borck's affidavit support Hopkins statement in her affidavit that, "[a]t no time did Sutton inform [her] that he was threatened or needed protection from his cellmate, prisoner Miles." (Dkt. 25-13, Pg ID 226, ¶ 6). Additionally, since Wilson gave Sutton's kite to Hopkins to address and resolve, Hopkins would have been aware of its contents. As discussed above, the contents of the kite do not indicate that there was a serious risk of harm to Sutton. As such, there appear to be no facts from which to infer a serious risk of harm, and no evidence that Hopkins drew the inference of any such risk to Sutton.

Moreover, Hopkins was not deliberately indifferent to a serious risk, even if she was aware of a serious risk. First, when Sutton approached her directly about making a cell change, rather than ignoring his request, she told Sutton the steps he needed to take in order to transfer. It appears Hopkins did not have the authority to move Sutton to a different cell on her own because she explained that such transfer requests had to go to the resident unit manager, Wilson. Second, she

attempted to take action on Sutton's subsequent kite once Wilson made the referral. According to the response to Sutton's grievance on the matter, after receiving the kite from Wilson, Hopkins called Sutton at the end of the day Friday, January 3, 2014, but Sutton was at work, so Hopkins planned to call him Monday, January 6, 2014, but did not get the opportunity to do so as the two men were already in segregation. (Dkt. 25-3, Pg ID 125).

Though Wilson claims she passed Sutton's kite on to Hopkins, Hopkins does not acknowledge receipt of the kite in her affidavit. However, this potential factual question is of no moment because the substance of the kite did not provide facts from which to infer a serious risk of harm. And there is no evidence indicating that Hopkins was made privy to Miles' conversation with Wilson and Gillespie-Borck. Hence, she knew no more than what she knew when Sutton first approached her about a transfer. At most she knew that there was a potential for a fight, but she did not know that Miles had asked about what would happen if he "beat his (Sutton's) old ass." Nor did she know that Wilson had responded to Miles to do what he had to do. Taken together, a reasonable jury could not find that Hopkins was aware of facts from which to infer a serious risk of harm to Sutton. And because she reasonably responded to Sutton's request for a cell change, the undersigned suggests that Hopkins is entitled to summary judgment.

With regard to Hopkins, this case is also somewhat similar to, although not on all fours with, a case from this circuit, *Green v. Schofield*, 2015 WL 2345220 (W.D. Tenn. May 14, 2015). In *Green*, the prisoner plaintiff had been moved to protective segregation because of threats of violence from a gang within the prison, but later was moved back to general population. *Id.* at *2. Green claimed that he explained to a corrections officer, Rose, that his life would be in danger in general population, but she told him the release papers had already been signed by a higher prison official and told him that if he felt threatened, he could "check back into protective custody." *Id.* at *3. Green was later attacked by gang members. *Id.* Green sued a number of prison officials for failure to protect, including Rose. The court held that Rose was entitled to summary judgment on the claim for the following reasons:

> Defendant Sharon Rose relied on an order that was given to her by Central Control—the Protective Services Hearing report—which indicated that Plaintiff was to be moved to Site 1. Defendant Rose had no authority to disregard those instructions, and had no reason to believe that she should question them. Because Plaintiff never indicated to Defendant Rose that his life was in danger, she did not have a valid reason to disregard the order to release Plaintiff back into general population.

> Even if Defendant Rose was aware of a serious risk to Plaintiff's safety, she did not disregard such a risk. Defendant instructed Plaintiff about how to check himself back into protective custody if he felt it was needed. This fact is admitted by Plaintiff in the grievance he filed after he was assaulted and is in his

> complaint ("I.R.C. Rose further said if the grievant felt threatened check back in and we'll start the process over."). Because Defendant Rose was unaware of a risk, but nevertheless took measures to ensure that Plaintiff had a way to protect himself from possible harm when he was released from protective custody, Defendant Rose is entitled to summary judgment.

*Id.* at \*6 (internal citations omitted).

It is true that, in *Green*, Rose was apparently working under an order to move the plaintiff to Site 1. Here, Hopkins was not ordered to keep Sutton in the cell with Miles. Instead, Hopkins referred Sutton to RUM Wilson, per MDOC policy on transfer requests. Thus, like Rose, Hopkins was working under a prison directive. But, similar to *Green*, Hopkins had no reason to disregard the prison policy that such requests were to go Wilson because she was unaware of facts indicating a serious risk of harm to Sutton, as discussed above. Further, like defendant Rose, even if she were aware of a serious risk of harm, it could not be said that Hopkins was deliberately indifferent to it. Hopkins did not disregard the risk, but rather informed Sutton of the steps he needed to take in order to obtain a cell change; and after receiving the kite from Wilson, Hopkins took fairly immediate steps to resolve the matter. Accordingly, the undersigned suggests that summary judgment be granted in Hopkins' favor.

C.    Eleventh Amendment and Qualified Immunity

As an alternative ground for dismissal of Sutton's claims, the defendants assert entitlement to qualified and Eleventh Amendment immunity.  (Dkt. 64, at p. 11).  Defendants are correct that they are entitled to Eleventh Amendment immunity on Sutton's claim for money damages against them in their official capacity.  Sutton asserted a § 1983 claim against the MDOC employees who were acting in their official capacities.   However, the Eleventh Amendment bars suit in federal court against a state and its departments or agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  The State of Michigan has neither waived its sovereign immunity nor consented to civil rights suits in federal court.  *See Johnson v. Dellatifia*, 357 F.3d 539, 545 (6th Cir. 2004).  Nor does the language of § 1983 permit suits against a State or its agencies.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (neither a State nor its officials acting in their official capacities are "persons" under §1983).  "[T]he eleventh amendment is not a bar to injunctive relief against the defendants in their official capacities."  *Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992).  "[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'"  *Id.* (quoting

*Will v. Michigan Dep't of State Police*, 491 U.S. 58, 73-4, n. 10 (1989)).  Sutton's

claims for money damages against Wilson and Hopkins in their official capacities

should be dismissed.

Defendants' sole argument for qualified immunity is that they did not violate

a constitutional right and thus have not violated clearly established law.  (Dkt. 64,

at p. 13-14).  Because there is a question of fact as to whether Wilson has violated

Sutton's Eighth Amendment right, the undersigned concludes that she is not

entitled to qualified immunity.  The doctrine of qualified immunity means that

"'[g]overnment officials performing discretionary functions generally are shielded

from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would

have known.'"  *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992) (quoting

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Defendants bear the burden of

pleading qualified immunity, but plaintiff bears the burden of showing that the

defendant's conduct violated a right so clearly established that a reasonable official

in his or her position would have clearly understood that he or she was under an

affirmative duty to refrain from such conduct.  *Sheets v. Mullins*, 287 F.3d 581,

586 (6th Cir. 2002) (citation omitted) (explaining that "[t]he ultimate burden of

proof is on the plaintiff to show that the defendant is not entitled to qualified

immunity").

The Supreme Court has established a two-part test in order to determine whether qualified immunity is applicable to a particular situation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The first part of the test involves a determination of whether the facts of the case, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right." *Id.* If the first question was resolved in the affirmative, then the court would decide "whether the right was clearly established." *Id.* If both questions are resolved in the affirmative, then the doctrine of qualified immunity would not apply, and the case could proceed. Conversely, if the answer to either question is no, then qualified immunity obtains. The court may consider the questions in whichever order the court concludes makes the most sense. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). "When a defendant invokes qualified immunity in a motion for summary judgment, the plaintiff must offer sufficient evidence to create a genuine dispute of fact that the defendant violated a clearly established right." *Folks v. Petit*, 676 Fed. Appx. 567, 569 (6th Cir. 2017) (citing *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 608–09 (6th Cir. 2015)).

As discussed above, there is an issue of fact as to whether Wilson was deliberately indifferent to a serious risk of harm to Sutton. Further, it is clearly established by the Supreme Court that "a prison official may be liable under the Eighth Amendment . . . if he knows that inmates face a substantial risk of serious

33

harm and disregards that harm by failing to take reasonable measures to abate it."
*Farmer*, 511 U.S. at 847.  The Sixth Circuit has consistently held that "'deliberate indifference' of constitutional magnitude may occur when prison guards fail to protect one inmate from an attack by another." *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990) (citing *Roland v. Johnson*, 856 F.2d 764, 769-70 (6th Cir. 1988) and *McGhee v. Foltz*, 852 F.2d 876, 880-81 (6th Cir. 1988)).

Since it is not clear whether Wilson has violated Sutton's clearly established Eighth Amendment right, the undersigned concludes that she is not entitled to qualified immunity at this juncture.

## IV.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendants Wilson and Hopkins' motion for summary judgment (Dkt. 64) be **GRANTED IN PART, DENIED IN PART**, and that defendant Hopkins be dismissed from this case and that claims against Wilson in her official capacity for damages be dismissed.

The parties to this action may object to and seek review of this Report and Recommendation but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

 Date:  June 7, 2019                                s/Stephanie Dawkins Davis
                                                    Stephanie Dawkins Davis
                                                    United States Magistrate Judge

35

## CERTIFICATE OF SERVICE

I certify that on June 7, 2019, I electronically field the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record and that I have mailed by United States Postal Service to the following non-ECF participant: JT Sutton #206240, Ionia Maximum Correctional Facility, 1576 W. Bluewater Highway, Ionia, MI 48846.

s/Tammy Hallwood
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov